Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

DAVID DEYOUNG, DERIVATIVELY
AND ON BEHALF OF BOFI HOLDING,
INC.,

       Plaintiff,

       vs.

GREGORY GARRABRANTS, ANDRE J.
MICHELETTI, ESHEL BAR-ADON, JOHN
C. TOLLA, THEODORE C. ALLRICH,
JOHN GARY BURKE, NICHOLAS A.
MOSICH, PAUL J. GRINBERG, JAMES S.
ARGALAS, JAMES J. COURT, EDWARD
J. RATINOFF, AND UZAIR DADA,

       Defendants,

       And

BOFI HOLDING, INC.

       Nominal Defendant.

CASE No.: **'16CV0163 WQHJMA**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**

**JURY TRIAL DEMANDED**

## **INTRODUCTION**

Plaintiff David DeYoung, ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Bofi Holding, Inc. ("BofI" or the "Company"), submits this Verified Shareholder Derivative Complaint against members of BofI's Board of Directors (the "Board") Gregory Garrabrants, Andre J. Micheletti, Eshel Bar-Adon, John C. Tolla, Theodore C. Allrich, John Gary Burke, Nicholas A. Mosich, Paul J. Grinberg, James S. Argalas, James J. Court, Edward J. Ratinoff, and Uzair Dada, (collectively, "Defendants") for breaches of their fiduciary duties as directors and/or officers of BofI, gross mismanagement, abuse of control, and unjust enrichment for her complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BofI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# NATURE OF THE ACTION

1.      This is a shareholder derivative action which seeks to remedy wrongdoing committed by Defendants between February 6, 2013 and the present (the "Relevant Period").

2.      BofI is the holding company of BofI Federal Bank which is a nationwide bank that provides consumer and business banking products through the Internet such as financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables.

3.      On or about October 13, 2015, a former internal auditor at BofI, Matt Erhart, filed a whistleblower complaint against BofI in federal court (the "Whistleblower Action"), alleging that during his time at BofI beginning in September 2013, he had uncovered numerous instances where BofI had: (i) violated federal and state law; (ii) failed in many respects to comply with regulations; (iii) failed make proper disclosures; and (iv) failed to comply with internal control procedures.

4.      When the news of the Whistleblower Action was revealed, BofI's stock declined $42.87 per share, or 30.2%, to close at $99.13 on October 14, 2015.

5.      Despite being made aware of its gross mismanagement, BofI failed to take corrective action or disclose this information to its investors. Throughout the Relevant Period, Defendants intentionally and/or recklessly caused BofI to issue

3

materially false and misleading statements and failed to disclose material adverse facts regarding the Company's business, operations, performance, and prospects. Particularly, Defendants caused BofI to make false and/or misleading statements and/or failed to disclose that: (i) the Company's internal controls were commonly disregarded; (ii) some of BofI's borrowers were foreign nationals who should have been off-limits under federal anti-money-laundering laws; (iii) many BofI accounts lacked required tax identification numbers; (iv) BofI violated the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 ("SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") by the Board causing the BofI to fire an internal auditor who raised issues to senior management and to federal regulators; and (v) as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

6.     During the Relevant Period, while the price of BofI stock was artificially inflated, a majority of the Board engaged in insider sales, reaping millions upon millions of dollars in net proceeds.

7.     The Company has been substantially damaged as a result of Defendants' knowing breaches of fiduciary duty and other misconduct.

## **JURISDICTION AND VENUE**

8.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the

4

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

10.     Each defendant has minimum contacts with this District, and they have entered into contracts in this District, have commonly traveled to this District on BofI's business, or have authorized acts and actions that have had a sufficient impact on this District or on BofI's shareholders and investors residing in this District to justify the exercise of jurisdiction over Defendants.

## **PARTIES**

11.     Plaintiff is a current shareholder of BofI. Plaintiff has been a shareholder of BofI common stock during the Relevant period and has continuously held BofI common stock at all relevant times.  Plaintiff is a resident of Utah.

12.     BofI, a nominal defendant, is a Delaware company headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122. BofI is a publicly traded company with its shares trading on the NASDAQ under the symbol "BOFI." At all material times to this action, BOFI Holding, Inc., an

entity d/b/a/ "BOFI Federal Bank" and Bank of the Internet," was a publicly traded company. BofI is a citizen of California and Delaware.

13.     Defendant Gregory Garrabrants ("Garrabrants"), at all relevant times, has served as BofI's President, Chief Executive Officer, and Director. Garrabrants is a citizen of California.

14.     Defendant Andrew J. Micheletti ("Micheletti"), at all relevant times, has served as Executive Vice President and Chief Financial Officer of BofI. Micheletti is a citizen of California.

15.     Defendant Eshel Bar-Adon ("Bar-Adon") is the Company's Executive Vice-President and Chief Legal Officer. Bar-Adon is a citizen of California.

16.     Defendant John C. Tolla ("Tolla") has been the Company's Chief Governance Risk and Compliance Officer since December 2013. Tolla is a citizen of California.

17.     Defendant Paul J. Grinberg ("Grinberg"), at all relevant times, has served as a member of the Board and serves as a member of the Compensation Committee. Grinberg is a citizen of California.

18.     Defendant Theodore C. Allrich ("Allrich"), at all relevant times, has served as Chairman of the Board of Directors  and served as Vice Chairman of the Board of Directors from 1999 to 2009. Allrich sits on the Compensation Committee of the Board. Allrich is a citizen of California.

19.     Defendant John Gary Burke ("Burke"), in all relevant times, has served as a member of the Board and is a member of the Compensation Committee and the Chairman of the Internal Assets Review Committee ("IAR Committee"). Upon information and belief, Burke is a citizen of Ohio.

20.     Defendant Nicholas A. Mosich ("Mosich"), at all relevant times, has served as Vice Chairman of the Board of Directors and as a member of the Board of Directors since May 2009. Mosich is a citizen of California.

21.     Defendant James S. Argalas ("Argalas"), at all relevant times, has served as a member of the Board of Directors. Argalas is a member of the Audit Committee and as a member of the Internal Asset Review Committee.

22.      Defendant James J. Court ("Court"), at all relevant times, has served as a member of the Board. Court is a citizen of California.

23.     Defendant Edward J. Ratinoff ("Ratinoff"), at all relevant times, has served as a member of the Board and as a member of the Nominating Committee. Ratinoff is a citizen of California.

24.     Defendant Uzair Dada ("Dada") has served as a member of the Board since January 2015. Dada is a citizen of California. According to the Company's 2015 Proxy Statement, during the 2015 fiscal year, Defendant Dada received as compensation from the Company:  $18,000 in cash and $67,061 in stock awards for his service as a non-employee Director.

25.     Defendants referenced in paragraphs 13 to 24 are sometimes referred to herein, collectively as "Defendants."

26.     Because of their positions at BofI, possessed the power and authority to control the contents of BofI's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Defendants caused the Company to make specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## DEFENDANTS' DUTIES

27.     By reason of their positions as officers, directors and/or fiduciaries of BofI and because of their ability to control the business and corporate affairs of BofI, owed BofI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BofI in a fair, just, honest, and equitable manner.  Defendants were and

are required to act in furtherance of the best interests of BofI and its shareholders so as to benefit all shareholders equally.

28.     Each director and officer of the Company owes to BofI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

29.     Because of their positions of control and authority as directors and/or officers of BofI, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of BofI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.     Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Defendants were required to, among other things: (i) ensure BofI operated in a diligent, honest, and prudent manner in accordance with its bylaws, charter, and the laws and regulations of Delaware and the United States; (ii) conduct the Company's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of BofI's business, to

avoid wasting BofI's assets and to maximize the value of BofI's stock; (iii) to fully inform themselves as to how BofI conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (iv) to establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records; (v) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BofI's operations and financial statements comply with all laws; (vi) exercise reasonable control and supervision over public statements made by BofI's officers and employees and any other reports on information made by BofI was required by law to disseminate; and (vii) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of BofI and to make full and accurate disclosures of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32.    Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a

risk of serious injury to the Company. Defendants' conduct has been ratified by Defendants who collectively comprised the BofI's Board at all relevant times.

33.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to correct such dissemination of inaccurate and untruthful information. Accordingly, Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws by causing BofI to make misrepresentations and omissions during the Relevant Period.

34.    To discharge their duties, the officers and directors of BofI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of BofI were required to, among other things: (i)    refrain from acting upon material inside corporate information to benefit themselves; (ii) ensure that the Company complied with its legal obligations and requirements, (iii) including acting only within the scope of its legal authority and disseminating

11

truthful and accurate statements to the investing public; (iv) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (v) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; (vi) remain informed as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and (vii) ensure that BofI was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

35.     Defendants further owed to BofI and the shareholders the duty of loyalty requiring that each favor BofI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

36.     BofI was required to abide with Generally Accepted Accounting Principles ("GAAP") when issuing its financial statements. GAAP is a common set

of accounting standards and procedures recognized by accounting professionals and used to compile financial statements.

37.    The accounting profession recognizes GAAP is recognized as the conventions, rules, and procedures which are necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that do not follow and are in compliance with GAAP are presumed to be misleading and inaccurate, despite other disclosures. Regulation S-X mandates that interim financial statements must comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures pursuant to 17 C.F.R. § 210.10-01(a).

38.    During the Relevant Period, BofI filed several annual reports with the SEC on Form 10-K on September 4, 2013, August 28, 2014, and August 26, 2015. Each 10-K stated that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

39.    In actually, Defendants failed to endure that BofI followed GAAP during the Relevant Period.

## **CONTOL, ACCESS, AND AUTHORITY**

40.    Because of their advisory, executive, managerial, and directorial positions with BofI, Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of BofI.

41.     Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BofI.

42.     Defendants was the agent of each of the other Defendants and of BofI, and was at all times acting within the course and scope of such agency.

## BREACHES OF FIDUCIARY DUTIES

43.     By virtue of his or her position as a director and/or officer, Defendants owed to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of BofI, as well as in the use and preservation of BofI's property and assets. Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to BofI and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to BofI.

44.     Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements and/or failing to disclose that: (i) the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws; (ii) the Company had as many customer accounts without tax identification numbers,

contrary to BofI's representations to its primary regulator, the OCC; (iii) as a result, the Company's revenue and financial results were overstated; (iv) the Company's financial statements were not prepared in accordance with GAAP; (v) BofI lacked adequate internal and financial controls; and (vi) as a results of the foregoing, BofI's financial statements were materially false and misleading at all relevant times.

45.     As a result of Defendants' actions and course of conduct, BofI is now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law. As a result, BofI has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## **DEFENDANTS' MISCONDUCT**

46.     BofI is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables. With approximately $6.3 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners.

47.     As a federally-chartered savings and loan association, BofI is in a highly regulated field. Among others, BofI is regulated by the Office of the Comptroller of the Currency ("OCC"), the Financial Industry Regulatory Authority

("FINRA"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, and the Consumer Financial Protection Bureau ("CFPB").

48.     BofI is subject to a variety of statues including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA PATRIOT Act, including the Know Your Customer Rule ("KYC"), the Dodd-Frank Act, and SOX, the Securities Act of 1933, and the Exchange Act.

49.     BofI Federal Bank's most important business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

50.     BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ Global Select Market under the symbol "BOFI."

51.     On February 6, 2013, Defendants caused BofI to file a Form 10-Q with the SEC for the quarter ending December 31, 2012 (the 2Q13 10-Q"). The 2Q13 10-Q was reviewed by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q13 10-Q contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 4Q12 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2Q13 10-Q represented the BofI's financial results for the quarter:

**BofI HOLDING, INC. AND SUBSIDIARY**
**SELECTED CONSOLIDATED FINANCIAL INFORMATION**

| *(Dollars in thousands, except per share data)* | At or for the Three Months Ended December 31, | | | | At or for the Six Months Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2012** | | **2011** | | **2012** | | **2011** | |
| *Selected Income Statement Data:* | | | | | | | | |
| Interest and dividend income | $ | 33,567 | $ | 28,616 | $ | 64,556 | $ | 56,381 |
| Interest expense | | 8,631 | | 9,530 | | 17,135 | | 19,118 |
| Net interest income | | 24,936 | | 19,086 | | 47,421 | | 37,263 |
| Provision for loan losses | | 1,950 | | 1,600 | | 4,500 | | 3,963 |
| Net interest income after provision for loan losses | | 22,986 | | 17,486 | | 42,921 | | 33,300 |
| Non-interest income | | 6,249 | | 2,986 | | 13,010 | | 7,556 |
| Non-interest expense | | 12,781 | | 9,204 | | 24,313 | | 18,756 |
| Income before income tax expense | | 16,454 | | 11,268 | | 31,618 | | 22,100 |
| Income tax expense | | 6,686 | | 4,608 | | 12,861 | | 8,907 |
| Net income | $ | 9,768 | $ | 6,660 | $ | 18,757 | $ | 13,193 |
| Net income attributable to common stock | $ | 9,436 | $ | 6,280 | $ | 18,348 | $ | 12,687 |
| *Per Share Data:* | | | | | | | | |
| Net income: | | | | | | | | |
| Basic | $ | 0.71 | $ | 0.56 | $ | 1.44 | $ | 1.15 |
| Diluted | $ | 0.70 | $ | 0.54 | $ | 1.37 | $ | 1.14 |
| Book value per common share | $ | 17.08 | $ | 14.80 | $ | 17.08 | $ | 14.80 |

17
Verified Shareholder Derivative Complaint

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tangible book value per common share | $ | 17.08 | $ | 14.80 | $ | 17.08 | $ | 14.80 |
| **Weighted average number of shares outstanding:** | | | | | | | | |
| Basic | | 13,224,612 | | 11,174,947 | | 12,707,837 | | 11,036,046 |
| Diluted | | 13,824,440 | | 12,304,628 | | 13,538,503 | | 11,415,793 |
| Common shares outstanding at end of period | | 12,824,195 | | 11,419,584 | | 12,824,195 | | 11,419,584 |
| Common shares issued at end of period | | 13,665,957 | | 12,162,604 | | 13,665,957 | | 12,162,604 |
| **Performance Ratios and Other Data:** | | | | | | | | |
| Loan originations for investment | $ | 331,999 | $ | 132,153 | $ | 611,696 | $ | 384,779 |
| Loan originations for sale | | 280,569 | | 227,810 | | 535,365 | | 318,179 |
| Loan purchases | | — | | — | | 1,541 | | — |
| Return on average assets | | 1.45% | | 1.23% | | 1.45% | | 1.26% |
| Return on average common stockholders' equity | | 17.32% | | 15.86% | | 17.85% | | 16.55% |
| Interest rate spread[1] | | 3.69% | | 3.44% | | 3.63% | | 3.47% |
| Net interest margin[2] | | 3.81% | | 3.60% | | 3.76% | | 3.62% |
| Efficiency ratio | | 40.98% | | 41.70% | | 40.23% | | 41.85% |
| **Capital Ratios:** | | | | | | | | |
| Equity to assets at end of period | | 8.44% | | 8.71% | | 8.44% | | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | | 8.52% | | 8.27% | | 8.52% | | 8.27% |
| Tier 1 risk-based | | 13.95% | | 13.19% | | 13.95% | | 13.19% |

capital ratio[3]

| | | | | |
|---|---|---|---|---|
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| *Asset Quality Ratios:* | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at end of period | 0.52% | 0.53% | 0.52% | 0.53% |
| Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

52.    The 2Q13 10-Q stated the following with respect to the quarter's financial results:

**RESULTS OF OPERATIONS**
**Comparison of the Three and Six Months Ended December 31, 2012 and December 31, 2011**

For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011. Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended December 31, 2012 and 2011, respectively. For the six months ended December 31, 2012, we had net income of $18.8 million compared to

net income of $13.2 million for the six months ended December 31, 2011. Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

- Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods. Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011. The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31,2011, primarily because loan rates have been pushed lower by the economy and competition. This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011. The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points , respectively, as we allowed the higher rate time deposits to roll of the books.

- Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees. The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $689, 000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts.

53.    The 2/6/1310-Q also contained the following:

**FINANCIAL CONDITION**
**Balance Sheet Analysis**
      Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31,     2012 from $1,720.6     million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

| (Dollars in thousands) | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| Residential real estate loans: | | | | |
| Single family (one to four units) | $ 1,215,744 | 55.6 | $ 863,624 | 49.6 |
| Home equity | 25,742 | 1.2 | 29,167 | 1.7 |
| Multifamily (five units or more) | 766,247 | 35.0 | 687,661 | 39.5 |
| Commercial real estate | 28,681 | 1.3 | 35,174 | 2.0 |
| Consumer—Recreational vehicle | 21,494 | 1.0 | 24,324 | 1.4 |
| Commercial secured and other | 128,267 | 5.9 | 100,549 | 5.8 |
| Total loans held for investment | $ 2,186,175 | 100.0 | $ 1,740,499 | 100.0 |
| Allowance for loan losses | (11,449) | | (9,636) | |
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | | (10,300) | |
| Net loans held for investment | $ 2,155,306 | | $ 1,720,563 | |

Verified Shareholder Derivative Complaint

54.    On May 8, 2013, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending March 31, 2013 (the 3Q13 10-Q"). The  3Q13 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 3Q13 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 3Q13 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.    The  3Q13 10-Q stated in relevant part:

For the three months ended March 31, 2013, we had net income of $10.4 million compared to net income of $7.7 million for the three months ended March 31, 2012. Net income attributable to common stockholders was $10.1 million or $0.74 per diluted share compared to net income attributable to common shareholders of $7.3 million or $0.58 per diluted share for the three months ended March 31, 2013 and 2012, respectively. For the nine months ended March 31, 2013, we had net income of $29.2 million compared to net income of $20.9 million for the nine months ended March 31, 2012. Net income attributable to common stockholders was $28.4 million or $2.12 per diluted share compared to net income attributable to common shareholders of $20.0 million or $1.68 per diluted share for the nine months ended March 31, 2013 and 2012, respectively.

*        *        *

Net interest income increased $5.9 million and $16.0 million in the quarter and nine months ended March 31, 2013 due to a 28.3% and 24.6%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods.

*        *        *

The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting

56.     On September 4, 2013, BofI filed an annual Form 10-K with the SEC providing the Company's financial and operating results for the fiscal year ended June 30, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff. The 2013 10-K contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.     The 2013 10-K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

General.  As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency].  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

58.    The 2013 10-K contained BofI's financials for the quarter, including BofI  reporting net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.

59.   Matt Erhart ("Erhart"), a former FINRA regulator, on or about September 23, 2013, began working for BofI as an internal auditor, performing audits of a variety of aspects of BofI's operations.

60.   On November 5, 2013, Defendants caused BofI to file a Form 10-Q with the SEC for the quarter ending September 30, 2013 (the "1Q14 10-Q"). The 1Q14 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 1Q14 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.   The 1Q14 10-Q reported that BofI had a net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

62.   On December 4, 2013, BofI filed Form 8-K with the SEC, signed by Defendant Micheletti, containing an Investor Presentation concerning the Company's first quarter of 2014 financial and operating projections (the "1Q14 Investor Presentation"). The 1Q14 Investor Presentation specified that if investors had questions they should contact Defendant Garrabrants and stated in relevant part:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial".;
- Bofi is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because [BofI's] Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

63.    On or about December 19, 2013, Erhart finalized his internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing those income streams in return for a lump sum. Erhart found that during the internal audit was that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.

64.    On or about December 19, 2013, Erhart and his manager Jonathan Ball ("Ball") were asked by Defendant Bar-Adon, BofI's Chief Legal Officer and Executive Vice President, to meet in order to discuss the audit of the Structured Settlements and Lottery line of business.  In this line of business, BofI, through its subsidiary Anfed Bank, purchased structured settlements from plaintiffs in litigation, and lottery payments from winners of the lottery. Defendant Bar-Adon told employees to remove evidence of the violation of  California Penal Code §632 from the audit of the Structured Settlements and Lottery. Ball informed Defendants Bar-Adon that an internal auditor was not permitted to do that, Defendant Bar-Adon

27

instructed Erhart to mark the entire report "Attorney Client Privileged," stating that the findings could be discoverable in class action litigation against BofI and this would prevent that problem. In addition, Defendant Bar-Adon instructed Erhart not to speak to any employee in the Structured Settlements and Lottery Department.

65.    On the same day, Defendant Tolla instructed Erhart never to state in an audit report that BofI violated a federal or state law.

66.    In or about January 2014, Thomas Constantine ("Constantine"), BofI's Chief Credit Officer, met with Erhart, Ball, and a few others. At the meeting Constantine stated he was not responsible for any of BofI's numbers after they are turned over to Defendant Micheletti, the CFO. Constantine emphasized that he could and would not vouch for the accuracy of the numbers once the CFO had them, basically calling into question the accuracy of such numbers and Defendant Micheletti changing the numbers after they are received.

67.    On February 5, 2014, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending December 31, 2013 (the 2Q14 10-Q"). The 2Q14 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q14 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 2Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2Q14 10-Q reported BofI's net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37

28

million, compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue of $31.19 million for the same period in the prior year.

68.     On February 6, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing BofI's 2Q14 Investor Presentation with financial and operating projections (the "2Q14 Investor Presentation").   The 2Q14   Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

69.     On May 6, 2014, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending March 31, 2014 (the "3Q14 10-Q"). The 3Q14 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q14 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 3Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 3Q14 10-Q reported net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million, compared to net income

of $10.40 million, or $0.74 per diluted share, on net revenue of $33.04 million for the same period in the prior year.

70.     On May 7, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 3Q14 financial and operating projections (the "3Q14 Investor Presentation").  The 3Q14 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's  "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

71.     On August 7, 2014, Defendants caused BofI to issue a press release and filed a Form 8-K with the SEC to announce BofI's financial and operating results for the fourth quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K"). The 2014 Form 8-K, and press release, were prepared by Defendants Garrabrants and Micheletti and signed by Defendant Micheletti.  For the fourth quarter, BofI reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year. For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income

of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for fiscal year 2013.

72.     On August 28, 2014, Defendants caused BofI to file its annual report on Form 10-K with the SEC providing the Company's financial and operating results for the fiscal year ended June 30, 2014(the "2014 10-K").  The 2014 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff, and it contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73.     In the 2014 10-K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

General.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address

terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.   In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

74.   On September 3, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 4Q14 financial and operating projections (the "4Q14 Investor Presentation").   The Q4 2014 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production"

75.   On November 4, 2014, Defendants cause BofI to file a Form 10-Q with the SEC for the period ending September 30, 2014 (the 1Q15 10-Q). The 1Q15 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 1Q15 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 1Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 1Q15 10-Q reported that for the quarter BofI had  net income of $17.84 million, or $1.20 per diluted share, on net

Verified Shareholder Derivative Complaint

revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

76.    On November 17, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 1Q15 financial and operating projections (the "1Q15 Investor Presentation"). The 1Q15 2015 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

77.    On or about November 21, 2014, Erhart sent an email to BofI's Chief Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk Management ("ERM") audit. Erhart asked whether Williams thought BofI had a deposit concentration risk. Erhart was concerned and reported that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits.  This is problematic because when a large percentage of deposits are derived from a few depositors, sudden withdrawals can pose a serious challenge to a Bank's ability to stay afloat and maintain its regulatory compliance.

78.    On or about December 12, 2014, the SEC served a subpoena on BofI, requesting account-identifying information for an investment advisory firm identified as ETIA LLC ("ETIA").

79.    On or about December 18, 2014, Defendants caused BofI to respond to the SEC that it did not have any information regarding ETIA.

80.    In or about early January 2015, Erhart learned of the SEC subpoena, and knew that BofI did have a loan file containing information regarding ETIA. Erhart further learned that a file had been created in response to the SEC subpoena, containing the information regarding ETIA. Erhart learned from a BofI employee that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, before BofI sent its response to the SEC denying the existence of any such files.

81.    On or about January 15, 2015, the OCC, BofI's principal regulator, requested information on Bank accounts with no Tax Identification Numbers ("TINs").  BofI's responses to the OCC was that there were no accounts without TINs. This was untrue as Erhart had viewed a spreadsheet in the BSA ("Bank Secrecy Act") folder disclosing approximately 150-200 accounts where the borrowers did not have a TIN.

82.    In or about January 2015, Erhart conducted a Loan Origination Audit. During the Loan Origination Audit, Erhart discovered that BofI was making substantial loans to foreign nationals including Politically Exposed Persons

34

("PEPs") in potential violation of BSA/Know Your Customer rules. Erhart was able to uncover readily information that many of the borrowers were criminals and other suspicious persons who put the Bank at high risk for violating the BSA's Anti-Money Laundering Rules ("AML Rules"), as well as exposing BofI to reputational risk. The purpose of the AML Rules is to help detect and report suspicious activity including the predicate acts to money laundering and terrorist financing.  The PEPs included very high-level foreign officials from major oil-producing countries and war zones.

83.    On January 29, 2015, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending December 31, 2014 (the 2Q15 10-Q"). The 2Q15 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q15 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 2Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2Q15 10-Q reported BofI had net income of $19.37 million, or $1.26 per diluted share, on net revenue of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

84.    In or about February 2015, Erhart submitted two whistleblower tips to the SEC, one concerning the ETIA subpoena, and another regarding a suspicious loan customer.

Verified Shareholder Derivative Complaint

85.   In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise.  BofI responded that it had not received any such documents for the review period in question.  BofI, however, had a BSA spreadsheet Erhart had previously seen that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part. Erhart knew that BofI had been served with subpoenas.

86.   On March 2, 2015, Defendants caused BofI to file Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2Q15 financial and operating projections (the "2Q15 Investor Presentation").  The 2Q15 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

87.   On April 30, 2015, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending March 31, 2015 (the 3Q15 10-Q"). The 3Q15 10-Q was approved by the Board, including Defendant Dad who had recently joined the

Board effective January 22, 2105, and signed by Defendants Garrabrants and Micheletti. The 1Q15 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 1Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 3Q15 10-Q reported BofI reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

88.    On May 6, 2015, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 3Q15 financial and operating projections (the "3Q15 Investor Presentation"). The 3Q15 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production:;

89.    On July 30, 2015, Defendants caused BofI to issue a press release and file a Form 8-K with the SEC announcing BofI's financial and operating results for the quarter and fiscal year ending June 30, 2015 (the "2015 Form 8-K").  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted

share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year. For fiscal year 2015, BofI reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

90.     On August 10, 2015, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 4Q15 financial and operating projections (the "4Q15 Investor Presentation"). The 4Q15 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

91.     On August 22, 2015, Peter Eavis of the *The New York Times* published an article, titled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly," about BofI's robust growth during Defendant Garrabrants' time as CEO. The article stated, in relevant part:

As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms.  But because its

financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads - and setting off alarm bells as well. **The bank has made loans to people who were later found to have run afoul of the law**, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.

Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years - an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

"I am passionate about what we do here, and I believe in it," Mr. Garrabrants said in one of several telephone interviews in recent weeks. "We are proud of what we are doing here.  We try to really run a good, ethical shop, and I want people to know that."

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans - borrowers who may be more risky.  **Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering**. The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

*       *       *

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation - and losing money - as they bet against his firm's soaring stock.

"Here's the problem for them: They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said. And he says the bank is as judicious as any other lender in picking its borrowers.  "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

*       *       *

Verified Shareholder Derivative Complaint

*Still, Bank of Internet has lent money to some unsavory characters*. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud.  In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

*          *          *

*Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals."  It does not disclose exactly what proportion of its loans are made to foreigners.* When asked, Mr. Garrabrants said it was "nowhere near the majority." *Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.*

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance.  *Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment.  Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator.  She declined to provide details.*

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up

concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit.  The deal was concluded this month.

(Emphasis added).

92.    On August 26, 2015, Defendants caused BofI to file an annual report on Form 10-K with the SEC providing the Company's financial and operating results for the fiscal year ended June 30, 2015 (the "2015 10-K").  In the 2015 10-K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

General. As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA PATRIOT Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA PATRIOT Act.

93.   The 2015 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Dada, Grinberg, and Ratinoff, and it contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

94.   BofI filed a Proxy Statement on September 4, 2015 (the "2015 Proxy"). In the 2015 Proxy, the Board along with the Audit, Nominating and Compensation Committees, along with the four risk committees (the Credit, the Internal Assets Review, the Operations and Technology, and the ALCO committees), provide enterprise-wide oversight of the BofI's management and handling of risk.

95.   These committees report regularly to the Board on risk-related matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

96.   In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore,

current risk management issues are discussed regularly with the Board and its committees.

97.     BofI's 2015 Proxy states:

Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees. The Company's management is responsible for assessing and managing risk and communicating risks to the Board. The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and Chief Executive Officer, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate. The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create stockholder value. ERM program leaders make regular reports to the Board regarding the ERM program's risk identification, management and mitigation strategy recommendations.

While the Board has retained the responsibility for general oversight of risks and of our ERM program, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee primarily oversees those risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements, while the Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities associated with risks arising from employee compensation policies and practices. Each standing committee provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting.

98.     The statements referenced in paragraphs 46-97 were materially false and misleading because Defendants falsely stated and/or failed to disclose material

43

adverse facts about the Company's business, operations, prospects, and performance.  Specifically, during the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BofI's internal controls were frequently disregarded; (ii) BofI was making risky and potentially illegal loans to Politically Exposed Persons; (iii) many BofI accounts lacked required tax identification numbers; (iv) BofI violated the California penal code and hid such fact in its public filings; (v) BofI took unnecessary regulatory risks in making loans to foreign investors and in its high deposit concentration; (vi) BofI failed to provide timely and accurate responses to regulators; (vii) BofI fired a whistleblower internal auditor  who raised the foregoing issues to management and to federal regulators; and (viii) as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

99.   After the market closed on October 13, 2015, *The New York Times* published the article titled "Ex-Auditor Sues Bank of Internet" reporting that Erhart filed a lawsuit against BofI for violating federal laws designed to protect whistleblowers.  The Whistleblower Action alleged, *inter alia*, that:

- BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator;

- BofI at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at BofI to management and federal regulators.

100.   On this news, the prices of shares of BofI stock fell $42.87, or 30.2%, to close at $99.13 per share on October 14, 2015.

## **DAMAGES TO BOFI**

101.   BofI has been, and will continue to be, severally damages and injured by Defendants' misconduct.

102.   As a direct and proximate result of Defendants' conduct, BofI has expended and will continue to expend significant sums of money.

103.   Such expenditures include, but are not limited to, legal fees associated with the class action lawsuit filed against the Company and certain Defendants for violations of the federal securities laws, defense of the Whistleblower Action, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

104.   Such costs include, but are not limited to, compensation and benefits paid to Defendants who breached their fiduciary duties to BofI.

105.   As a direct and proximate result of Defendants' conduct, BofI has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misconduct done and misrepresentations made by Defendants and caused to be made by the Company by Defendants.

## DERIVATIVE ALLEGATIONS

106.   Plaintiff brings this action derivatively and for the benefit of BofI to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of BofI, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

107.   BofI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.   Plaintiff is, and at all relevant times has been, a BofI shareholder. Plaintiff will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

109.   Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. Defendants caused the Company to conceal the true facts as alleged herein.

110.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, failure to manage regulatory compliance and internal corporate controls; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees; and (iii) to artificially inflate the Company's stock price.

111.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, Defendants who are directors and/or officers of BofI were  direct, necessary, and substantial participants in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

112.   Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

113.   At all times relevant hereto, Defendants were the agent of each other and of BofI, and was at all times acting within the course and scope of such agency.

## DEMAND FUTILITY ALLEGATIONS

114.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.   A pre-suit demand on the BofI's Board is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of the following nine Defendants: Garrabrants, Allrich, Burke, Mosich, Grinberg, Argalas, Court, Ratinoff, and Dada,  (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to five of the nine directors that were on the Board at the time this action was commenced.

116.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and the false and misleading statements and omissions of material facts, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

117.   In complete abdication of their fiduciary duties, the Directors either participated in or were recklessly unaware of materially false and misleading statements contained in the Company's public filings.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.

While investors were duped into believing the fraud perpetrated by Defendants, a majority of the Directors sold millions upon millions of dollars' worth of Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

118.   The entire Board faces a substantial likelihood of liability for retaliating against Erhart as a Whistleblower in violation of SOX. Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected

activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

119.    Erhart filed a complaint with OSHA in regards to the retaliation he faced after reporting the allegedly unlawful activities at BofI to federal agencies and regulators.

120.    On March 12, 2015, Defendant Bar-Adon met with Erhart and told

121.    him he was acting as General Counsel to BofI's Audit Committee, comprised of Defendants Grinberg (Chairman), Mosich, and Argalas. Thus, Grinberg, Mosich, and Argalas had actual knowledge of Erhart's whistleblower complaints, and had directed Bar-Adon to meet with Erhart regarding such activities.

122.    As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich, and Argalas) reported Erhart's complaints and whistleblowing activity to the full Board at the next meeting it held subsequent to March 12, 2015. During fiscal year 2015, BofI's Board met eight times; as a result, the Board was meeting on average approximately every six weeks. As a result, Defendants Allrich, Garrabrants, Burke, Court, Ratinoff, and Dada received actual knowledge of Erhart's complaints and whistleblowing activity shortly after March 2015.

123.   Despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015. All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley and Dodd-Frank.

124.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Erhart during the Relevant Period because the wrongdoing concerned the Company's core (and only) business – consumer and business banking products and services.

125.   Demand on Defendant Garrabrants is futile because he is BofI's President and Chief Executive Officer, and is thus a non-independent director. By its own admittance, the 2015 Proxy stated "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." Defendant Garrabrants was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings that he signed.  His millions of dollars in stock holdings, worth $40 million, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Garrabrants is a defendant in the securities fraud class action lawsuit. Finally, Defendant Garrabrants conducted little, if any, oversight of the

Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Accordingly, for these reasons, too, Defendant Garrabrants breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126. Demand on Defendant Ginsberg is futile as he has served as a compensated Company Director throughout the Relevant Period. His insider sales before the fraud was exposed, which yielded over 1.5 million dollars in proceeds, demonstrates his motive in facilitating the fraud. His Company stock holding – worth $1.66 million – reveals his interest in keeping the Company stock price as high as possible. Defendant Ginsberg was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Ginsberg conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Ginsberg breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Demand on Defendant Allrich is futile as he has served as a compensated Company Director and Chairman of the Board of Directors throughout the Relevant Period. The large amount of Company stock that he owns – worth $4.75 million – reveals his interest in keeping the Company stock price as high as possible. His insider sales before the fraud was exposed, which yielded over a million dollars in proceeds, demonstrates his motive in facilitating the fraud. Defendant Allrich was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Finally, Defendant Allrich, as Chairman of the ALCO Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Allrich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Demand on Defendant Burke is futile as he has served as a compensated Company Director throughout the Relevant Period. The large amount

of Company stock that he owns – worth $41.46 million – reveals his interest in keeping the Company stock price as high as possible. His insider sales before the fraud was exposed, which yielded $855, 571 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Burke was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Burke is a member of the Compensation Committee and the IAR Committee. As a member of each of these Committees, Defendant Burke conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.   Demand on Defendant Court is futile as he has served as a compensated Company Director throughout the Relevant Period.  His insider sales before the fraud was exposed, which yielded $268,498 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Court was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. As a member of the Audit Committee and of the IAR

Committee, Defendant Court conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Court breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.   Demand on Defendant Ratinoff is futile as he has served as a compensated Company Director throughout the Relevant Period.  His insider sales before the fraud was exposed, which yielded $397,506 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Ratinoff was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. As Chairman of the Credit Committee and as member of the Nominating Committee, Defendant Ratinoff conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Ratinoff breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.   Demand on Defendant Mosich is futile as he has served as a compensated Company Director and Vice Chairman of the Board of Directors throughout the Relevant Period. The large amount of Company stock that he owns – worth $2.14 million – reveals his interest in keeping the Company stock price as high as possible. Defendant Mosich was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Mosich, as a member of the Audit Committee and ALCO Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Thus, for these reasons, too, Defendant Mosich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.   Demand on Defendant Argalas is futile as he has served as a compensated Company Director throughout the Relevant Period.  The large amount of Company stock that he owns – worth $803,000 – reveals his interest in keeping the Company stock price as high as possible. Defendant Argalas was ultimately

responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Argalas, as a member of the Audit Committee and of the IAR Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Argalas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.   Demand on Defendant Dada is futile follow as he has served as a compensated Company Director since January 2015. Defendant Dada was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Dada conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Dada breached his fiduciary duties, faces a substantial likelihood of liability, is not

Verified Shareholder Derivative Complaint

independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Demand on the Board is futile follow as the Compensation Committee determines, in conjunction with the Board, the reasonableness of the compensation paid to Board members, as well as the CEO and officers.  Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Garrabrants, who made and/or was responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to correct those false and misleading statements.

135.   The Directors have longstanding business and personal relationships with each other and Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question Defendants' conduct. Thus, any demand on the Directors would be futile.

136.   BofI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful

conduct to attempt to recover for BofI any part of the damages BofI suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

137. Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

138. The acts complained of herein constitute violations of fiduciary duties owed by BofI's officers and directors, and these acts are incapable of ratification.

139. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of BofI. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of

the officers of BofI, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

140.  If there is no directors' and officers' liability insurance, then the Directors will not cause BofI to sue Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

141.  Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST COUNT
### Against Defendants for Breach of Fiduciary Duties

142.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.  Defendants owed BofI fiduciary obligations. By reason of their fiduciary relationships, Defendants owed to the Company the duty to exercise

candor, good faith, and loyalty in the management and administration of BofI's business and affairs.

144.   Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

145.   Defendants' conduct set forth herein was due to their intentional, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  By engaging in the improper activity detailed herein, Defendants intentionally, recklessly, or with gross negligence, breached or disregarded their fiduciary duties to protect the rights and interests of BofI.

146.   In breach of their fiduciary duties owed to BofI,  Defendants willfully engaged in misconduct and participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

147.   In further breach of their fiduciary duties owed to BofI, Defendants willfully engaged in misconduct -- and certain of them engaged in insider selling of Company stock on material non-public information -- and participated in the Company's failure to maintain adequate internal controls and comply with regulatory requirements, and federal and state law, rendering them personally liable to the Company for breaching their fiduciary duties.

148.   Defendants had actual or constructive knowledge that they had engaged in misconduct and caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were made, and were subsequently not corrected, knowingly or recklessly and for the purpose and effect of artificially inflating the price of BofI's securities.

149.   Defendants failed in their duty of oversight and compliance with regulations and federal and state laws.   Defendants further failed in their duty to correct errors, misstatements and omissions when it became known to them.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, and failed to correct such misrepresentations and omissions.   Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly.   Such failure to correct the material

misrepresentations and/or omissions was caused to be done knowingly or recklessly.

151.   As a direct and proximate result of Defendants' breaches of their fiduciary obligations, BofI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

152.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

## SECOND COUNT
### Against Defendants for Abuse of Control

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BofI, for which they are legally responsible.

155.   As a direct and proximate result of Defendants' abuse of control, BofI has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BofI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

156.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

## THIRD CLAIM
### Against Defendants for Gross Mismanagement

157.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.  By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BofI in a manner consistent with the operations of a publicly-held banking entity and with federal and state law.

159.  As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, BofI has sustained and will continue to sustain significant damages.

160.  As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

161.  Plaintiff, on behalf of BofI, has no adequate remedy at law.

## FOURTH COUNT
### Against Defendants for Unjust Enrichment

162.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.  By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, BofI.

164.   Defendants either received bonuses, stock options, or similar compensation from BofI that was tied to the financial performance or artificially inflated valuation of BofI or received compensation that was unjust in light of Defendants' bad faith conduct.

165.   Plaintiff, as a shareholder and a representative of BofI, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, proceeds from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

166.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

### FIFTH COUNT
**Against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for Breach of Duty of Honest Services**

167.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.   This claim is brought derivatively on behalf of the Company against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for breach of their undivided duty of loyalty to their employer.

169.   Garrabrants, Micheletti, Bar-Adon, and Tolla were employees of BofI during the Relevant Period.

170.   Garrabrants, Micheletti, Bar-Adon, and Tolla breached their duty of loyalty to BofI by not acting solely in the Company's interests in performing their employment duties.

171.   Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to issue false statements regarding its operations and financial results, misstate the fact that the Company maintained adequate internal controls, fire whistleblower Erhart in violation of the Dodd-Frank and Sarbanes-Oxley laws, and cause the Company to make other false and misleading statements during the Relevant Period. Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

172.   BofI was harmed by these Defendants' breaches of the undivided duty of loyalty.

173.   By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of

66

BofI, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BofI;

(c)   Determining and awarding to BofI the damages sustained by it as a result of the violations set forth above from each of Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing BofI and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BofI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of BofI to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding BofI restitution from Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated : January 22, 2016              **THE ROSEN LAW FIRM, P.A.**

<u>/s/ Laurence M. Rosen</u>
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

<u>VERIFICATION</u>

I, David DeYoung, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of January, 2016

_____
David DeYoung